**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LAWRENCE KRIEGER, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | Case No. |
| v. ) | **CLASS ACTION COMPLAINT FOR** |
| ADVANCED DISPOSAL SERVICES, INC., RICHARD BURKE, ERNEST J. MROZEK, B. CLYDE PRESLAR, MICHAEL J. HOFFMAN, E. RENAE CONLEY, TANUJA M. DEHNE, and MICHAEL KOEN, ) ) ) ) ) ) ) | **VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** **JURY TRIAL DEMANDED** |
| Defendants. ) | |

Plaintiff Lawrence Krieger ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Advanced Disposal Services, Inc. ("Advanced Disposal" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Advanced Disposal, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Advanced Disposal and Waste Management, Inc. ("Waste Management").

2.     On April 14, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to

receive $33.15 in cash for each share of Advanced Disposal stock they own (the "Merger Consideration").

3.      On May 10, 2019, in order to convince Advanced Disposal shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading Proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act.

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Advanced Disposal shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Advanced Disposal's financial advisor, UBS Securities LLC ("UBS") in support of its opinion that the Merger Consideration is fair to shareholders on which the Board relied.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Advanced Disposal shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Advanced Disposal maintains its principal executive offices in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of Advanced Disposal common stock.

12.     Defendant Advanced Disposal is incorporated in Delaware and maintains its principal executive offices at 90 Fort Wade Road, Ponte Vedra, Florida 32081. The Company's common stock trades on the NYSE under the ticker symbol "ADSW."

13.     Individual Defendant Richard Burke is Advanced Disposal's Chief Executive Officer and Chairman and has been a director of Advanced Disposal since July 2014.

14.     Individual Defendant Ernest J. Mrozek has been a director of Advanced Disposal since February 2018.

15.     Individual Defendant B. Clyde Preslar has been a director of Advanced Disposal since October 2016.

16.     Individual Defendant Michael J. Hoffman has been a director of Advanced Disposal since October 2017.

17.     Individual Defendant E. Renae Conley has been a director of Advanced Disposal since August 2017.

18.     Individual Defendant Tanuja M. Dehne has been a director of Advanced Disposal since August 2017.

19.     Individual Defendant Michael Koen has been a director of Advanced Disposal since August 2016.

20.     The Individual Defendants referred to in paragraphs 13-19 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Advanced Disposal (the "Class"). Excluded from the Class

are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of May 7, 2019, there were approximately 89,000,000 shares of Advanced Disposal common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of Advanced Disposal will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the

Proposed Transaction based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.      The Proposed Transaction

23.      Advanced Disposal is a provider of non-hazardous solid waste collection, transfer, recycling and disposal services operating primarily in secondary markets or under exclusive arrangements. The Company operates in 16 states and the Commonwealth of the Bahamas. Advanced Disposal has two different types of markets: (i) the Company owns and/or operates its own landfill; and (ii) a municipality owns the landfill. In markets where Advanced Disposal owns

and/or operates a landfill, the Company creates and maintains vertically integrated operations through which customers' waste is managed from the point of collection through the point of disposal.  In markers where a municipality owns the landfill, the Company focuses selectively on opportunities where exclusive arrangements can be negotiated with the municipal owner.

24.     On April 15, 2019, Advanced Disposal and Waste Management issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> HOUSTON & PONTE VEDRA, Fla.--(BUSINESS WIRE)--Waste Management, Inc. (NYSE: WM) and Advanced Disposal Services, Inc. (NYSE: ADSW) announced today that they have entered into a definitive agreement under which a subsidiary of Waste Management will acquire all outstanding shares of Advanced Disposal for $33.15 per share in cash, representing a total enterprise value of $4.9 billion when including approximately $1.9 billion of Advanced Disposal's net debt. The per share price represents a premium of 22.1% to Advanced Disposal's closing share price as of April 12, 2019, the last trading day prior to today's announcement, and a premium of 20.9% to Advanced Disposal's 30-day volume weighted average price as of the same date.
>
> Waste Management is North America's premier environmental solutions company. This acquisition grows Waste Management's footprint and allows Waste Management to deliver to Advanced Disposal customers unparalleled access to differentiated, sustainable waste management and recycling services. With 2018 revenues of $1.56 billion, adjusted EBITDA of $427 million and approximately 6,000 employees, Advanced Disposal serves more than 3 million residential, commercial, and industrial customers, including over 800 municipalities primarily in 16 states in the Eastern half of the United States. Advanced Disposal's solid waste network includes 94 collection operations, 73 transfer stations, 41 landfills, and 22 owned or operated recycling facilities.
>
> "At Waste Management, we focus on creating value for all stakeholders, delivering on our commitments to employees, customers, community partners, shareholders and the environment. The acquisition of Advanced Disposal extends these commitments by adding complementary assets and operations as well as a team with a shared focus on safety, outstanding service and operational excellence," said Jim Fish, President and Chief Executive Officer of Waste Management. "With this acquisition, we will grow our asset footprint to serve more customers and communities and generate significant growth and value creation opportunities for Waste Management's shareholders and our combined company's employee base. Waste Management's disciplined capital allocation and balance sheet strength position us well to execute upon this unique opportunity to expand our scale and capabilities to serve an even broader customer base and realize the strategic and

financial benefits the acquisition of Advanced Disposal creates."

"We are pleased to have reached this milestone agreement with Waste Management to deliver an immediate cash premium to Advanced Disposal stockholders. We view Waste Management as an industry leader with one of the most respected brands in the nation," said Richard Burke, Chief Executive Officer of Advanced Disposal. "This acquisition stands as a testament to the strength of the Advanced Disposal business and brings together two strong waste management teams with extensive environmental services expertise to better serve our customers and communities. We look forward to working with the Waste Management team to complete the transaction and ensure that we continue to deliver the highest quality service to our customers."

**Compelling Strategic and Financial Benefits**

The acquisition advances Waste Management's growth strategy and aligns with the Company's financial goals, including growth in earnings per share, margins, and cash flow. Specifically, Waste Management expects the addition of Advanced Disposal to:

- **Expand Waste Management's Footprint and Customer Base.** This acquisition brings a high-quality, complementary asset network and customer base under Waste Management's proven management team, who has a track record of operational excellence and a demonstrated ability to grow the margins and cash flows of the assets Waste Management has acquired.
- **Create Significant Synergies and Grow Waste Management's Earnings and Cash Flows.** Waste Management expects the transaction to generate more than $100 million in annual cost and capital expenditure synergies. The Advanced Disposal acquisition will be immediately accretive to Waste Management's adjusted earnings per share and cash flow, with near-term benefits expected from core operating performance and SG&A cost savings. Incremental benefits from operating and capital efficiencies and network optimization will drive long-term margin expansion and improved free cash flow conversion.
- **Support Waste Management's Capital Allocation Priorities.** Waste Management's strong balance sheet and significant free cash flow generation position it well to fund the acquisition. In 2019, Waste Management's free cash flow will be directed to dividend payments, acquisitions and share repurchases sufficient to offset dilution from stock-based compensation plans. The Advanced Disposal acquisition will enhance Waste Management's cash flow growth and support its commitment to grow shareholder returns. Waste Management currently expects to achieve targeted leverage and return to normal run-rate share repurchases within one year of the acquisition's close.
- **Continue a Commitment to Outstanding Customer Service and**

**Sustainable Waste Solutions.** The acquisition will join two teams of dedicated employees who are passionate about helping to manage the environmental needs of customers and communities with outstanding service and a commitment to safety. Waste Management expects to continue making investments in employees, technology, and capital equipment to further grow the business, and ensure superior, reliable customer service, and generate strong returns.

**Financing**

The transaction is not subject to a financing condition. Waste Management intends to finance the transaction using a combination of bank debt and senior notes. Following completion of the transaction, Waste Management expects to maintain a strong balance sheet and solid investment grade credit profile with a pro forma leverage ratio within the Company's long-term targeted net debt-to-EBITDA range of 2.75x to 3.0x.

**Timing and Approvals**

The transaction, which was unanimously approved by the boards of directors of both companies, is expected to close by the first quarter of 2020, subject to the satisfaction of customary closing conditions, including regulatory approvals and approval by a majority of the holders of Advanced Disposal's outstanding common shares.

In connection with the definitive agreement, Canada Pension Plan Investment Board, which owns approximately 19% of Advanced Disposal's outstanding shares, has, under the terms of a voting agreement, agreed to vote its shares in favor of the transaction.

**Companies Confirm 2019 Guidance and Waste Management Confirms Schedule for Upcoming First Quarter 2019 Earnings Call**

Both Waste Management and Advanced Disposal remain confident in the strength of their businesses and expect to achieve previously announced full-year guidance, excluding transaction-related considerations.

As previously announced, Waste Management will release its first quarter 2019 financial results before the opening of the market on Thursday, April 25, and will hold a conference call at 10 a.m. ET. On the call, Waste Management's management team will also discuss the Advanced Disposal acquisition announcement.

Advanced Disposal will release its first quarter 2019 financial results on Tuesday, April 30, after closing of the market. In light of the pending acquisition, Advanced Disposal will no longer host its conference call on Wednesday, May 1 or attend the

Macquarie Business Services Conference on Thursday, May 2 in Boston.

**Advisors**

Centerview Partners LLC is serving as exclusive financial advisor to Waste Management, and Simpson Thacher & Bartlett LLP and Vedder Price P.C. are serving as Waste Management's legal counsel. UBS Investment Bank is serving as exclusive financial advisor to Advanced Disposal, and Shearman & Sterling LLP and Mayer Brown LLP are serving as Advanced Disposal's legal counsel.

**ABOUT WASTE MANAGEMENT**

Waste Management, based in Houston, Texas, is the leading provider of comprehensive waste management environmental services in North America. Through its subsidiaries, Waste Management provides collection, transfer, disposal services, and recycling and resource recovery. It is also a leading developer, operator and owner of landfill gas-to-energy facilities in the United States. Waste Management's customers include residential, commercial, industrial, and municipal customers throughout North America. To learn more information about Waste Management, visit www.wm.com or www.thinkgreen.com.

**ABOUT ADVANCED DISPOSAL**

Advanced Disposal, based in Ponte Vedra, Florida, is the fourth largest solid waste company in the U.S. and provides integrated, non-hazardous solid waste collection, recycling and disposal services to residential, commercial, industrial, and construction customers across 16 states and the Bahamas. To learn more information about Advanced Disposal, visit www.AdvancedDisposal.com.

25.     Advanced Disposal is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

**II.     The Materially Incomplete and Misleading Proxy**

26.     On May 10, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote

in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materially Misleading Sales Process*

27.     According to the *Background of the Merger*, before the Company agreed to the Proposed Merger with Waste Management, Advanced Disposal spoke with other bidders and discussions with two bidders, Company A and Company B, were fruitful enough to enter into confidentiality agreements.  Proxy 36.  During the second quarter of 2018, Company A and Company B separately contacted Advanced Disposal expressing potential interest in a material transaction.  *Id.*  In June 2018, Advanced Disposal entered into confidentiality agreements with both Company A and Company B.  *Id.*  The interactions with Company A and Company B did not lead to the companies making a bid.  *Id.*

28.     The *Background of the Merger* does not disclose any of the terms of the confidentiality agreements with A and B, including whether the confidentiality agreements the contained a standstill provision.  The existence of this provision in the confidentiality agreement is material to the Company's shareholders because they relate to Company A and Company B's ability to re-enter negotiations after the Company engaged in discussion with Waste Management. In order to assess whether the Board acted in the best interests of Company shareholder, Defendants must disclose the specific terms of the confidentiality agreements with Companies A and B..

29.     Additionally, the Company, but more specifically Individual Defendant Richard Burke, who was the driving force behind the negotiations solely with Waste Management, appears to be interested in consummating a transaction only with Waste Management and showed no interest to seek out other bidders for the Company.  The Board decided on two different occasions that it was in the best interest of the shareholders to not engage in a market check.  The first time was on January 25, 2019, early in Waste Management's bidding process. *Id.* at 37. The second time was on April 10, 2019, after Waste Management had made its "'best and final'" offer and the Company had already negotiated a large portion of the Merger Agreement with Waste Management.  *Id.* at 39-40.  When the Board declined to preform a market check on April 10, 2019, Mr. Burke "reminded the Board of the history of prior discussions with Company A and Company B" and "the Board concluded that it was unlikely that any other party would be able to match or exceed the terms of the transaction proposed by Waste Management." *Id.* at 40.  The *Background of the Merger* discloses that both Company A and Company B decided not to make an offer because in their respective opinions they could not offer a price that would be considered an attractive premium to Advanced Disposal.  *Id*. at 36.  However, there is no indication of how the companies knew what would be attractive enough for the Board to accept considering the Board accepted a low premium of 22.1%, as compared to the domestic average control premium of 63.3% and the domestic median control premium of 28.5%.[1]

30.     The Company also entered into a joint defense agreement with Waste Management on December 7, 2018, for the stated purpose of sharing confidential information in connection

---

[1]     *Compare* Proxy 42, *with Control Premium Study*, Factset Mergerstat, ii (Excluding Negative Premiums) (2d Quarter 2018), *available at*, https://www.bvresources.com/docs/default-source/sample-reports/control-premium-study-quarterly-report.pdf (last visited May 14, 2019).

with regulatory matters without waiving legal privileges or protections.  Proxy 36.  Nothing more is said about this agreement.

31.     The Company must disclose: (i) additional terms of the confidentiality agreements with Companies A and  B, including whether they contained  a standstill provision (and  a "don't ask don't waive" clause which may have further restricted A and B's ability to enter into negotiations with Advanced Disposal); (ii) the rational the Company did not perform a market check; and (iii) the rationale  for the Company's decision to enter into a joint defense agreement with Waste Management.  The omission of this material information renders the *Background of the Merger* section materially misleading.  A shareholder needs to know detailed information about the sales process to determine if the Merger Consideration is truly a fair representation of the company's value, and the omitted information is information any reasonable shareholder would find material.

### The Materiality of Financial Projections

32.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the Proxy discloses the Board discussed the Company's "strategic plan as an independent standalone company and the projections. . . ."  *Id.* at 40.

33.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

34.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

35.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

36.     Here, Advanced Disposal's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on the financial forecasts to determine "that the merger consideration . . .

represents full and fair value for shares of Advanced Disposal common stock, taking into account . . . Advanced Disposal's near-term and long-term standalone plan in the event Advanced Disposal were to remain an independent public company . . . ." Proxy 42.

37.    As discussed further below, the non-GAAP financial projections here do not provide Advanced Disposal's shareholders with a materially complete understanding of the assumptions and key factors considered in developing financial projections, which assumptions, factors and other inputs the Board reviewed.

### The Financial Projections Relied on by the Board

38.    The Proxy discloses that the Company's management "shared certain non-public, unaudited prospective financial information prepared by [management] for strategic planning purposes with the Board, Waste Management and UBS . . . ." *Id.* at 52.

39.    The Proxy further discloses that the financial projections were "prepared on a reasonable basis, reflected the best available estimates and judgments at the time of preparation, and presented as of the time of preparation, to the best of senior management's knowledge and belief, the expected course of action and the expected future financial performance of Advanced Disposal on a standalone basis . . . ." *Id.* at 53.

40.    The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2023 for: (1) Adjusted EBITDA and (2) Cash Flow from Operations less Adjusted Capital Expenditures but fails to provide (i) the line items used to calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 54.

41.    The Proxy defines Adjusted EBITDA as "EBITDA adjusted to exclude non-cash and non-recurring items, as well as other adjustments permitted in calculating covenant

compliance under the agreements governing Advanced Disposal's outstanding debt securities and credit facilities. Advanced Disposal excludes acquisition and development costs and stock-based compensation in its calculation of adjusted EBITDA." *Id.* at 54 n.1.  Nevertheless, the Proxy fails to disclose the line items used to calculate Adjusted EBITDA, rendering the Proxy materially false and/or misleading. *Id.*

42.     Additionally, the Proxy defines Cash Flow from Operations less Adjusted Capital Expenditures as "[r]eflect[ing] net cash provided by operating activities less adjusted capital expenditures (purchases of property and equipment, excluding expenditures for significant new municipal contracts and significant purchases of land for future landfill airspace and landfill construction and development), net of proceeds from the sale of property and equipment." *Id.* at 55 n.2.

43.     Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

44.     The financial projections disclosed on page 54 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9

because they are materially misleading, as shareholders are unable to discern the veracity of the financial projections.

45.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisor.

### The Financial Projections Violate Regulation G

46.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[2] and adopted Regulation G[3] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[4]

47.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures

---

[2]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[3]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[4]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm (last visited May 14, 2019) ("SEC, *Final Rule*").

. . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[5]

48.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[6]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Advanced Disposal included in the Proxy here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[7]

49.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence 5

---

[5]     SEC, *Final Rule.*

[6]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/ (last visited May 14, 2019); Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0 (last visited May 14, 2019).

[7]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted) (last visited May 14, 2019).

(Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[8] with *Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[9] *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[10]

50.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

---

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm (last visited May 14, 2019).

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf (last visited May 14, 2019)

[10]    *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm (last visited May 14, 2019). *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/00000000001 0060087/filename1.pdf (last visited May 14, 2019). *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/0000000000 17025180/filename1.pdf (last visited May 14, 2019).  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions and reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such at the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on. *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited May 14, 2019).

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

51.     In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures. Nor can shareholders compare the Company's financial prospects with similarly situated companies.

52.     Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above.  Indeed, Defendants acknowledge that "[n]on-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by Advanced Disposal may not be comparable to similarly titled amounts used by other companies."  Proxy 54.

53.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

54.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 54, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### The Materially Misleading Financial Analyses

55.     The summary of the valuation methodologies utilized by UBS, including the utilization of certain of the non-GAAP financial projections described above by UBS, in connection with its valuation analyses, (*id.* at 47) is misleading in violation of Regulation 14a-9. The opacity concerning the Company's internal projections renders the valuation analyses

described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once a proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

56.     With respect to UBS's *Trading Statistics for Selected Public Companies Analysis*, UBS reviewed the enterprise values as a multiple of EBITDA, projected and estimated with respect to calendar year 2019, ("EV/2019E Market Adjusted EBITDA") and the equity market value calculated based on closing stock prices on April 12, 2019 as a multiple of projected and estimated calendar year 2019 free cash flow ("P/2019E FCF") for four comparable companies.  *Id* at 49. UBS calculated the mean and median of the comparable companies' EV/2019E Market Adjusted EBITDA multiple to be 13.0x and 12.4x, respectively and the mean and median of the comparable companies' P/2019E FCF to be 25.7x and 23.2x, respectively.  *Id.* at 50.

57.     UBS applied a multiple range of 10.0x to 11.5x for the Company's Market Adjusted EBITDA and 17.5x to 22.0x for the Company's P/2019E FCF.  *Id* at 50.  The applied ranges appear to be low in light of the comparable companies.  The high end of the selected range falls below the mean and median for both the EV/2019E Market Adjusted EBITDA multiple and the P/2019E FCF multiple.  It is unclear if the comparable companies even had an influence in UBS's analysis considering the multiple ranges fall very close to the implied trading multiples for Advanced Disposal.  *Id.*

58.     The Proxy must disclose what effect the comparable companies had on the selection of the multiple ranges.  The absence of the above information renders UBS's *Selected Public Companies Analysis* incomplete and misleading as it appears to only be a "proof" that using Advanced Disposal's current market multiples with Advanced Disposal's metrics will demonstrate

that the offering price is a premium to the Company's current market price.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

59.     With respect to UBS's *Precedent Transactions* analysis, UBS reviewed nine transactions and calculated the target company's enterprise value as a multiple of last twelve months Market Adjusted EBITDA ("EV/LTM Market Adjusted EBITDA"). *Id* at 50-51.  The EV/LTM Market Adjusted EBITDA mean and median was 9.7x and 9.1x respectively.  UBS applied a multiple range of 9.5x to 12.0x to Advanced Disposal's actual 2018 Market Adjusted EBITDA to estimate an implied per share consideration for the Company. *Id.* at 51.

60.     UBS appears to have included old transactions in the analysis. 4 of the 9 selected transactions were announced prior to August 1, 2012.  It is unlikely that these transactions are still representative of current day transactions.  Moreover, by including these transactions, the mean and median appear to be artificially lowered.  All 4 of the 4 old transactions fall below the mean and median of the precedent transactions' EV/LTM Market Adjusted EBITDA. *Id.*

61.     When the 4 old transactions are removed, the mean and median shifts up to 10.98x and 10.1x, respectively.  Therefore, it appears that UBS has used a multiple range for the Company that is not representative of current market trends.  The failure to disclose why the old transactions aren't stale renders UBS's *Precedent Transactions* analysis incomplete and materially misleading.  Shareholders are unable to discern the veracity of the *Precedent Transactions* analysis.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

62.     With respect to UBS's *Discounted Cash Flow Analysis*, the Proxy states that UBS used the management projections to perform the discounted cash flow analysis on Advanced Disposal. *Id.*  It appears that UBS used management's forecasted Cash Flow from Operations less Adjusted Capital Expenditures for calendar years 2019 through 2023 to calculate the net present

value of the estimated unlevered free cash flows and calculated a terminal value by applying multiples of 9.5x to 11.5x to the last twelve months Market Adjusted EBITDA. *Id.* UBS used a discount rate of 8% to 9% based on the Company's weighted average cost of capital. *Id.* at 52.

63. The Company does not make clear what information UBS utilized in the *Discounted Cash Flow Analysis*. UBS states it "calculated ranges of implied present values . . . of the standalone, unlevered, free cash flows that Advanced Disposal was forecasted to generate. . . ." *Id.* at 51. UBS does not disclose the actual numbers used, but it states the numbers used were prepared by management. *Id.* However, the only numbers management provides are projections for cash flow from operations minus capital expenditures, which UBS has already used and called "free cash flow." *Id.* at 49. Free cash flow and unlevered cash flow are not the same. Therefore, it is not clear that UBS used Cash Flow from Operations less Adjusted Capital Expenditures in the discounted cash flow, and, if UBS did use Cash Flow from Operations less Adjusted Capital Expenditures, then it is misleading because UBS has used the same projection but called it two different things throughout its fairness opinion.

64. Additionally, the Company did not disclose the values UBS calculated for the range of terminal values, any of the inputs that went into calculating the Company's weighted average cost of capital, how stock-based compensation was treated, or the fully diluted shares of Advanced Disposal. The Proxy also fails to disclose the inputs and assumptions that went into selecting the last twelve months Market Adjusted EBITDA multiple range of 9.5x-11.5x.

65. Since information was omitted, shareholders are unable to discern the veracity of UBS' *Discounted Cash Flow Analysis*. Without further disclosure, shareholders are unable to compare UBS's calculations with the Company's financial projections. The absence of any single piece of the above information renders UBS's *Discounted Cash Flow Analysis* incomplete and

misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

66.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . " *Id*.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

67.     Therefore, in order for Advanced Disposal shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

68.     In sum, the Proxy independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Advanced Disposal shareholders.

69.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## **COUNT I**

### **(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

70.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

71.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

72.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

73.     The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

### COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

76.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

77.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

78.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed

to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

79.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

80.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

81.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

82.     Advanced Disposal is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

83.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the

Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT III

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

84.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

85.     The Individual Defendants acted as controlling persons of Advanced Disposal within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Advanced Disposal, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

86.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

87.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous

recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the Proxy.

88.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

89.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

90.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained

as a result of their wrongdoing and to award damages arising from proceeding with the Proposed

Transaction;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  May 14, 2019

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By:  */s/ Michael Van Gorder*
Michael Van Gorder (#6214)
3828 Kennett Pike, Suite 201
Wilmington, DE 19807
Tel.: (302) 482-3182
Email: mvangorder@faruqilaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Counsel for Plaintiff*